Our third case is 23-1238 Cronick v. Pryor. Mr. Doherty, you may proceed. May it please the Court, my name is Ryan Doherty, and today I'm here on behalf of Robert McCafferty and Christopher Pryor. These officers submit that the District Court erred in denying them qualified immunity. I'm going to focus my remarks today on what I believe to be the crux of this appeal, which is whether the officers had probable cause, whether actual or arguable, to arrest Cronick for failing to desist or disperse. In doing so, I think this Court needs to review the events that occurred prior to the arrest and take those historical facts from the perspective of a reasonable officer in determining whether qualified immunity is appropriate. Do we do that based on the universe of facts that the District Court found? We do, Your Honor. I have, and that's what I would request this Court do. I believe that we prevail whether we take that set of facts or the other set of facts, which I'll just briefly tell you about. Well, we can't take another set of facts, can we? No, and this would just Is there any point in going over facts that we can't consider? I think you can consider these. But that's outside our jurisdiction. We're back to collateral order review, right? Unless they blatantly contradict. Thank you, Your Honor. Is that what you're saying? That's where I was going. And I don't think it's important here, but I do think it's important if you believe that we need to quibble about the words that were used for the order. What findings within the universe of facts that the District Court found would you argue were blatantly contradicted by any of the various videos? Sure, and again, I believe that we prevail even with the universe of facts that the Court found. However, there is one, certainly, on page 285 of the appendix. The District Court suggests that Pryor, when he directs Cronick to leave the scene, uses interrogatives. Well, he did. I mean, you could see it on Pryor's video. And in your brief, you never say that Pryor said, Cronick, you are to leave. I think, or in front of me, but I think your argument in your appellate brief is, well, why are you still sticking around? Why don't you leave the immediate premises? And she says, because I live here. I live in this motel. So you're not suggesting, are you, or are you, that when the District Court said there was no order to leave, that that is blatantly contradicted under Scott because he didn't use a question. He used a command. You're not arguing that, are you? I'm saying that if you're going to make that distinction, we need to at least have the proper words before this Court. OK. And so the words that the District Court used are, why don't you go over there? Why don't you leave the scene? That is not what Officer Pryor said. If you look at Appendix 168 at 756 to 803, Officer Pryor said, and I want to back up to get to the facts beforehand so you then understand why this would make a difference. But I'm just going to tell you what the difference is here. He says, OK, then. I'll tell you what. Why don't you leave? Leave the immediate area. And he's interrupted. He says, why don't you leave? Mrs. Cronick, as you brought up, Judge Buckrock, said, no. No. I don't need to. I live here. And then Pryor says, leave the immediate area and uses physical touch to move her out of the way. I don't think we need to get to that to determine whether there's probable cause in this case, but I at least wanted the record to be clear on that. The State Court found that was not an order, didn't it? The municipal court, using the same words, why don't you go over there, why don't you leave the scene, did find that, Your Honor. I'm not seeking, on behalf of my clients, to re-litigate the criminal case. And the probable cause standard is low. I don't need to prove that. This court doesn't need to find that. What this court needs to find is that there was a probability, based on a reasonable officer, his perspective, that she had violated a law in his presence. I want to go back to set the scene. These officers showed up to a dying man. They were called to show up to a dying man. They came with lights on, they came with uniforms. Called by Ms. Cronick. That is what the court found, technically called by her husband, but I won't quibble with that. It was certainly called by Ms. Cronick. She requested them to arrive. They did arrive. McCafferty arrived first, and what did he find? A man dying in an unsecured crime scene. And Ms. Cronick standing over a dying man. What did McCafferty also find? Someone was moving in and out of the room, taking stuff out of that crime scene. Moving stuff around. He asked her to stop. She continued to do that. Eventually, he had to detain her because she continued to do that. Additionally, he found someone else in a room. Who was unknown. Now, Ms. Cronick, as the district court found, did say there was a gentleman in there. But McCafferty is dealt with that unsecured crime scene and people moving in and out of it. Before his backup officers arrive. His backup officers arrive. And by the way, this is a dangerous area. The court did find them. It's a well-known dangerous area. Violence, drugs, alcohol. His backup officers arrive, and he puts them to work investigating that crime scene. Because as we all know, those officers have the right to secure that crime scene. To detain or control suspects and non-suspects in that area. Would you say the crime scene. Pryor and Cronick are both in the parking lot. They're not in the apartment. Do you agree with that? Yes, Your Honor. They are not in the apartment. The dying man has been dragged out. Right outside the driveway. The fire department is, let's say, here. The apartment is here. And Pryor is here. And Cronick is here. And so when he says, why don't you leave, ellipsis. Leave the immediate scene. And either touches her arm or whatever he does. You can see Pryor's video. She walks away. And he tails her into the middle of the parking lot. And then he and the first officer discuss whether or not to arrest her for disorderly conduct. And then the supervisor comes in and says, oh, I got an idea. A figure to disperse. To desist or disperse. There's the ticket. Let's put her in handcuffs and keep her in the back of a patrol car for 47 minutes. The court found that there was no order. You haven't argued in your appeal brief that that is blatantly contradicted by any of the video. If there's no order and the statute, the ordinance rather, starts out by requiring an order, how can there be arguable probable cause for a figure to desist or to disperse? In answer to that, I would say we need to go to where I started, which was. And also substantial interference with the crowd scene kind of linked together. That's correct. I think, however, if you look at the district court's order, appendix 301, the issue she takes with this is whether this was an order or not. There's no other part of that statute that is at issue for her in terms of a material fact that would discount qualified immunity in this case. And I wanted to go back to your question. If he says, why don't you leave? Well, because I live here. And then there's a finding that I wasn't ordered to leave. And there's also a finding that once she was asked to whatever, or the words whatever they were, it came out of the prior's mouth. If she does leave and he's the one that tails her, how can all of that, which is what the court found, that we're bound by, Lewis versus Strip, how can all of that amount to arguable probable cause for a failure to desist or disperse? So I'll back up again, and I will say this is a dangerous area. They don't know what's out there. They don't know what they're dealing with. If you look at what these officers do, McCafferty is there for eight minutes before the arrest occurs. Prior, less than that. But what happens right before he says the words that I've given you, is that she has disclaimed any knowledge of this, of the scene. She says, I don't know anything about this. I just called. So he has someone who he's investigating, trying to figure out what's going on. They don't know what they're dealing with at this point. She has now indicated, I'm not going to talk to you. He has to get back to secure a crime scene, make sure the medical personnel are safe, and continue his investigation of the scene. For any reasonable officer in that situation, after that occurs, understanding what he has to do, for the district courts to suggest that a reasonable officer, based on all these facts, based on what he's dealing with, didn't mean that Mrs. Cronick needed to leave so that he could continue his investigation. I don't think his reasonable or a prudent officer would have understood that to be the case. So in answer to your question, I think what we are asking this court to do is to take those facts and to determine whether there was probable cause based on all of those facts. And in this instance, what I think the district court has done is made an interrogative statement. She put question marks around it to make it appear unclear. However, if this court, based on a reasonable officer, stepped back and said he meant that she needed to leave, she said no, she stepped back and did not move. Can I just jump in? Yes, sir. Your argument seems almost to be asking us to do a de novo review, which we're not supposed to do on interlocutory review. If the district court found a fact, whether you agree with it or not, whether we agree with it or not, unless it's blatantly contradicted by the record, don't we have to accept that fact? Isn't that what the law is that is applied to this situation? I am not asking you to redo the facts in this case. But what I'm asking you to do is judge these facts based on the appropriate standard, what this court has deemed to be the appropriate standard to determine qualified immunity. So I'm not asking you to change what it is. Even if he did say, why don't you go over there, why don't you just leave the scene, any reasonable person understands that that means get out of here. What the court went on to say, there's a genuine issue as to whether she was asked to leave. We draw an inference at this point in favor of the plaintiff. We're going to have to draw that inference and find that she wasn't asked to leave. Can we change that at this point? Maybe if it weren't collateral or interlocutory review, but aren't you stuck with that finding and aren't we stuck with that finding? I think you're stuck with the finding of what he said. No, that's not what I asked. Are we stuck with the finding by the district court that she wasn't asked to leave? I don't think you are. And I don't think that oversteps the bounds of what you can do on this appeal. If you've got a case where we've done something like that, can you give us a case? I can give you two cases that I think I gave you in. Well, you probably did, but remind me. I see that I'm out of time. Go ahead and answer his question. Yes, Your Honor. Bustios v. City of Carlsbad and also Clark v. City of Boulder. In each of those cases, in Clark v. Boulder, one of your colleagues was sitting by designation. Again, this would be persuasive authority for you all. However, he said, based on what he saw in the facts, that probable cause wasn't present for when this individual could not have complied. So she was given two commands, get back, and then she was pushed and told to get back within a matter of a second or something along those lines. Your colleague agreed that that couldn't establish probable cause. But what he did find, which was different, was that there was probable cause for the plaintiffs. This is Clark. Yes, that's correct. Okay, I think we can look at that case.  Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I am Reid Allison, and I'm here on behalf of Sasha Cronick today. Can you get the mic up closer to your mouth? Yes, I probably can. I can also stay closer to it. Thank you, Your Honor. Thanks. So first, I'm glad all of Your Honors caught on on this, but though Ms. Cronick at that time lived in what has been described over and over again as a dangerous location, on this day she heroically helped to save this man's life. These two defendant officers knew that pretty much immediately, very early on in the interaction and well before defendant prior touched or grabbed Ms. Cronick and she began yelling and all of that. This was a drug overdose? It was, Your Honor. And essentially what happened is Sasha lived in that motel with her family. She was leaving her room that morning. It was nine-ish. I believe she was going to work, and she saw a man kind of under that awning on the sidewalk out in front of a different room. And I believe the other woman who was there with him cried out and said, he's overdosing. And that's when Sasha and her husband got in touch with 911 and Sasha helped coach this woman how to do CPR until the fire department arrived to take over. And so I think your points have all been correct with Mr. Daugherty, that the findings of the district court are pretty clear. Below, they argued three other substantial arguments. So the district court summary judgment order has a bunch of other things that aren't on this appeal. But I think the thoroughness of the entire order kind of speaks for itself. But the one that they've settled on today, before you all, is the failure to disperse. And obviously one of the elements of that crime is that an order is given. Obviously another element of the crime is that the person doesn't walk away. The district court made findings, essentially, that a reasonable jury could find from this video. First, that no order was given. And second, to the extent anything was close to an order, Ms. Kronick had turned and walked away. Is it possible for a reasonable officer that was standing by to interpret Officer Pryor's words to be the effect of an order? Or maybe to put it another way, are there circumstances in which an officer could interpret something that is explicitly framed as a question as being just a polite order? Well, to point you to Bustios, which Mr. Daugherty just raised, that case involved an order that ended with a question that I think is pretty telling. I'm going to ask you one more time. You're interfering with this investigation. Now you need to go one more time. Do you want to go to jail? Ends with a question. This makes clear that what's happening here is an order. Okay, so in other words, there are circumstances, as illustrated in Bustios, that an officer can, in effect, order someone to do something by putting it in the form of a question. Yes, Your Honor. Now, is it at least arguable that someone standing by, understanding what had transpired and what was continuing to transpire? After all, the overdose man, the wife had given CPR, but he still hadn't been shipped to the hospital yet. I mean, there's only three officers. These are two of them, McCafferty and Pryor. Is it at least arguable that someone would have heard Pryor's question and said, you know, he's telling her to get out of the way. We have this unconscious man. We've got this other unknown man who's obviously on drugs in the bathroom. The wife is packing up, and we want her out of the way, and she, although she had started out heroically, she is unquestionably disrupting. Demanding to talk to the supervisor, yelling about the arm being, Pryor touching her arm, holding her arm, and they are trying to tend to an emergency situation. Why isn't it at least arguable that they had probable cause that even though we are bound by the judge's word that there was no order, that the words were close enough that they could be reasonably interpreted as being in effect a polite command. Get the heck out of the way, ma'am. We've got business to attend to, and we can't do that. Yes, Your Honor, to that I would say to your point about how she's being disruptive. That only happens after Pryor asks for those questions or maybe one question and one thing that's close to a question, as we've discussed today, and then touches her without her consent. But all the while, she's walking away. When he touches her, she is already turned around to do what he's asked. There's not another order or anything like an order after that. The next thing that's discussed is McCafferty arrives and says, hey, I heard yelling, so I came outside. Do we need to arrest her for disorderly conduct? And then they talk in front of Sasha about what to arrest her for, and then they grab her ostensibly for disorderly conduct at that point. As a subset of that, couldn't that point illustrate that the law was not clearly established here and that even if they were wrong, our case law didn't clearly establish that arguable problem cause wasn't here and kind of fast-moving, fog of war type situation. That's one of the purposes of qualified immunity. For one thing about the fast-moving fog of war, Your Honor, it's true that that motel gets a lot of 911 calls. The body cam itself, I've seen a lot of body cams. It doesn't look all that fast-moving to me. They're keeping an eye on the people who they know are related somehow to the man who's overdosing. He's being cared for by the fire department. These officers are first priors just talking to Sasha Cronick. It's clearly a consensual encounter. At the point that she says, you know, that question's a little bit too specific and personal. She's like, I'm not going to answer that. Then he does what he does, quickly touches her. She starts yelling in a First Amendment-protected way. Sure, it was a scene, but to your point, I believe, Judge Bacharach, the scene was the man who was overdosing and the room that we know was connected to him and the two people who are also connected to that. So by the time she's grabbed and arrested, she's at least in the middle of the parking lot, if not marginally on the other side. So she has walked away from what could realistically be considered the scene. If there was more scene that needed to be gotten away from, they needed to specify that because she lives there. This is her home, right? So she has backed away from what looks like the scene because that is the scene. Can I just get back on this arguable probable cause that Judge Tinkovich was raising? Is there a distinction between, on the one hand, the district court saying that there's a genuine issue of fact, going to draw the inference that Officer Pryor did not issue the order? Okay, so we have that. But is that something that is different from the question of whether a reasonable officer could nonetheless think that she had been asked to leave? And if so, why wouldn't they have arguable probable cause? First, Your Honor, I don't think, I think the district court evaluated it correctly, and the standard is what a reasonable officer would have thought or not. Well, let's split it into the two steps of qualified immunity. We have whether there was a violation because there was not probable cause, maybe for the reason that you just stated. But then we get to the second step of qualified immunity, and that is, well, was this a violation of clearly established law? Have you, you have the burden on that. Have you shown that there was no arguable probable cause? So what I would say to the step one versus step two is there's kind of an underlying step zero that applies to both of those prongs. And that comes from Tolan versus Cotton Supreme Court case and various other cases, which is even when you're doing just the second prong, the clearly established prong, you can't impute fact disputes into that. So for purposes of the clearly established question here, after the district court has made these correct findings, is would any reasonable officer know that they did not have probable cause to arrest someone who they had not given an order to disperse and or also who had walked away after what was said and is claimed to be an order was given? So Tolan versus Cotton says you've got to be very careful about the set of facts we're talking about and how we describe the clearly established question because it's very easy to slip into viewing essentially the facts in the light most favorable to defendants and putting that into the clearly established and saying, well, I don't know. Now, whether there's a case that says, you know, why don't you leave, is or is not an order, I'm not aware of such a case, but that strikes me as even for qualified immunity purposes, splitting hairs pretty thinly. Why isn't there an argument for qualified immunity, a stronger argument actually, for Officer McCafferty? Because didn't he rely on information from Officer Pryor? Yes, he did, although he did so after he had arrested Pryor. He comes to the scene, hears yelling, and says, hey, do we need to arrest her for disorderly conduct? They go back and forth a little bit, and then he arrests her apparently for disorderly conduct. As was discussed earlier, I believe it's Sergeant Inazu later comes to the scene. Well, I'm just wondering if you think they stand in different shoes on this issue. I don't because of how the facts actually played out, right? And that is, and it's reflected in the way that they argued at summary judgment, frankly. They argued for disorderly conduct at summary judgment. They argued for interference at summary judgment. They still, on the scene and at summary judgment, they were throwing everything at the wall they could, and that's fine. But that means that they're together on that, McCafferty and Pryor, in my view. So Mr. Dorey didn't address the search issue at all. I think once you, if there's an affirmance on the underlying arrest, that goes a long way to getting us all the way to affirming the search issue as well. The way the search is conducted certainly looks like a search incident to an arrest. It's kind of pro forma. It happens right after the handcuffer. If the arrest itself is affirmed as potentially a constitutional violation. Aren't pat-downs sometimes justified even in the absence of probable cause to arrest? There's a reasonable suspicion of some kind of potential danger. And given the context in which all of this was happening, did the dangerousness of the location justify the pat-down search? No, Your Honor. And that's, we cite a bunch of case law about mere presence in a high crime or a dangerous area is not enough. To that point, what had happened is Sasha Cronick had helped to save this man's life. She had given the police some information, including that she lived there, including that there was some other guy in the room that they should keep an eye out for and they went and found. Then she stopped. She has never done anything threatening. She never does anything threatening on the video. She never does anything suspicious on the video. She goes from being cordial enough and giving information to yelling at them for a very specific reason that's clear what she's mad about. Right. And that's very much First Amendment protected speech. So really all they have left is that she lives at this motel. And the motel is people who are, you know, these type of places are people who are on the fringes of society. It's very, very, very low income housing. It's the type of folks who are one step away from, unfortunately, living on the street. So to say that because a person lives there or even is present there is alone good enough to pat them down, I don't think suffices to satisfy decades worth of case law at this point. Was she patted down after Officer McCafferty told her she was under arrest? Yes, I believe so. It's my recollection of the video that he tells her that basically as he's grabbing her and then she ends up down on the ground. They handcuff her, they get her back up on her feet, handcuff behind her back, and then the pat down happens. So, yes. Unless there are other questions, I would ask that the district court's summary judgment denial of these claims be affirmed. Thank you, counsel. Counsel are excused. We appreciate your arguments this morning.